UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

CASE NO.: _____

| | | |
|---|---|---|
| TAMRA BENFIELD, as Administrator to the Estate of GEORGE WESLEY BENFIELD | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| GARRY MCFADDEN in his Official capacity; MECKLENBURG COUNTY; TELISA WHITE in her Individual capacity; LARRY HOUPE in his Individual capacity; ANTHONY DURRAH in his Individual capacity; KHRISLYN MACKIN in her Individual capacity; TRICIA BEATTY in her Individual capacity; BRUCE PARKER in his Individual capacity; RESERVE HEALTH, PC; DANIEL T. BIONDI in his Official and Individual capacity; NORAH SHABA in her Individual capacity; DESTINI BETHEA in her Individual capacity; ARYN GRAHAM in her Individual capacity; MARYAH BANKS in her Individual capacity; PHYDRIA SCOTT in her Individual capacity; KEIARRA JONES in her Individual capacity; TIARRA SLADE in her Individual capacity; and OHIO CASUALLTY INSURANCE COMPANY; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) | |

NOW COMES Plaintiff, Tamra Benfield, as the Personal Representative of the Estate of George Wesley Benfield, by and through counsel, complaining of Defendants jointly and severally, hereby alleges and says:

## INTRODUCTION

1. On January 19, 2024, George Wesley Benfield was taken into custody and detained at the Mecklenburg County Detention Center Central (MCDCC).

2. Despite Mr. Benfield confirming his diagnoses of epilepsy, bi-polar disorder and substance abuse and addiction disorder and despite having medical confirmation of the same, Defendants failed to have Mr. Benfield evaluated by the MCDCC psychiatrist upon his admission to MCDCC or any time before his death on January 20, 2024.

3. Despite his clinical presentation causing him to be ineligible for medical clearance for admission to MCDCC, in violation of medical and facility protocols, Defendants orchestrated Mr. Benfield's admission to MCDCC and placed him in the infirmary housing unit.

4. Despite discovering that Mr. Benfield was unresponsive in his cell within MCDCC's infirmary housing at or before 2:35 a.m. on January 20th, neither MCDCC detention nor medical staff took any steps to immediately render aid or provide the required medical intervention.

5. It was not until after 3:11 a.m., more than 35 minutes after discovering Mr. Benfield was unresponsive, did any member of MCDCC staff initiate resuscitation efforts.

6.     And that time, MCDCC detention and medical staff confirmed that Mr. Benfield was cold to the touch, not breathing and pulseless.

7.     Botched resuscitation attempts by both MCDCC detention and medical staff, included failures related to compression administration, airway clearing and the delivery of artificial respiration - the fundamental components for successful cardiopulmonary resuscitation.

8.     Medic arrived at Mr. Benfield's cell in the MCDCC infirmary at 3:21 and found Mr. Benfield to be cold to the touch, not breathing, pulseless and reported his presentation as "very dead".

9.     Mr. Benfield was transported via Medic to Atrium Main Emergency Department.  At no time between 3:11 am and his arrival at Atrium Main Emergency Department at 3:56 a.m., did Mr. Benfield resume breathing or regain consciousness or a pulse.

10.     Atrium Main Emergency medical staff continued chest compression on Mr. Benfield while administering medications to attempt to restart Mr. Benfield's heart and lungs, but to no avail. Mr. Benfield was pronounced dead at 4:06 a.m. on January 20, 2024.

11.     Plaintiff, as administrator of the Estate of George Wesley Benfield, brings this civil action pursuant to 42 U.S.C. § 1983, against (a) the individual Defendants for deliberate indifference to the serious medical and mental health needs of Mr. Benfield in violation of his substantive due process rights under the Fourteenth Amendment, and (b) Defendants Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve

Health, P.C. for their respective policies and/or customs of deliberate indifference to the serious medical needs of residents like George Benfield, with serious emergency medical needs as reflected by the lack of supervision and training.

12.     Plaintiff also brings claims under North Carolina law, including: (a) an official bond action, under N.C. Gen. Stat. § 58-76-5 against Sheriff McFadden and Ohio Casualty Insurance Company, (b) medical malpractice claims against the Medical Defendants, Dr. Biondi and Reserve Health, P.C., and (c) a corporate negligence and gross negligence action against Reserve Health, P.C.

## JURISDICTION AND VENUE

13.     Plaintiff, as administrator of the Estate of George Wesley Benfield, brings this civil action pursuant to 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Mr. Benfield of his due process rights as a pretrial detainee to be free from deliberate indifference to his serious medical needs under the Fourteenth Amendment to the United States Constitution.

14.     Plaintiff's actions arise under the United States Constitution and the laws of the United States.

15.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 (*federal question*), 1343(a)(3) and 1343(a)(4) (*civil rights*).

16.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the alleged violations of federal law are substantial, and the pendent causes of action derive from a common nucleus of operative facts.

17.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of North Carolina because all of the events giving rise to this action occurred in the Western District.

18.     This is a wrongful death action under N.C. Gen. Stat. § 28A-18-2 to recover damages for Mr. Benfield's wrongful death.

19.     This is also a survival action under N.C. Gen. Stat. § 28A-18-1 to recover damages for Mr. Benfield's personal injuries.

## PARTIES

### A.     PLAINTIFF

20.     Plaintiff, Tamra Benfield, is the lawfully designated Administrator of the Estate of her deceased son, George Wesley Benfield, (Mecklenburg County File No. 24E-002272-590) and is a citizen and resident of Mecklenburg County, North Carolina.

21.     George Wesley Benfield ("Mr. Benfield"), was born on September 18, 1980. He was 43 years old at the time of his death on January 20, 2024 in Mecklenburg County, North Carolina.

22.     Mr. Benfield was a pre-trial detainee and resident in the care and custody of the Mecklenburg County Sheriff at MCDCC at the time of his death.

23.     Mr. Benfield's heir at law is his mother, Tamra Benfield. Mr. Benfield was not married at the time of his death.

**B.     MECKLENBURG COUNTY**

24.     Defendant Mecklenburg County is a county in North Carolina organized and existing under N.C. Gen. Stat. § 153A-10, and it has all the corporate powers set forth in N.C. Gen. Stat. § 153A-11, including the power to be sued.

25.     Mecklenburg County is a "unit" and "local government" under N.C. Gen. Stat. § 153A-216, *et seq.* It has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail.

26.     Mecklenburg County maintains and operates Mecklenburg County Detention Center Central (MCDCC) located at 801 E. 4th Street, Charlotte, North Carolina. MCDCC is designed to house over 1900 residents.

27.     Mecklenburg County is responsible, under N.C. Gen. Stat. § 153A-225, for developing an adequate medical plan to provide medical care to residents at MCDCC, including the medical supervision of residents and emergency medical care for residents to the extent necessary for their health and welfare.

28.     At all times relevant to this action, Mecklenburg County had final policymaking authority over the provision of medical care and emergency medical care to residents at MCDCC.

29.     Upon information and belief, at all relevant times, Mecklenburg County and/or Sheriff McFadden contracted with Wellpath, LLC[1] to deliver medical and mental healthcare to MCDCC residents on behalf of Mecklenburg County and Sheriff McFadden.

---

[1] Wellpath has filed for bankruptcy and is not a named defendant in this complaint.

30.    Mecklenburg County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the serious medical needs of residents like Mr. Benfield, with severe drug intoxication at MCDCC.

31.    Upon information and belief, by obtaining liability insurance and/or participation in a governmental risk pool, or by contractually requiring its agents to purchase liability insurance and name Mecklenburg County as an additional insured, the County, on its own behalf as well as on its agents' behalf, has waived governmental immunity.

## C.    DEFENDANTS MCFADDEN, OHIO CASUALTY and DETENTION DEFENDANTS

32.    Upon information and belief, Defendant Garry L. McFadden ("Sheriff McFadden") is a citizen and resident of Mecklenburg County and, at all relevant times, was and is the current Mecklenburg County Sheriff and as such, he was and is the chief law enforcement officer for Mecklenburg County. Sheriff McFadden is sued in his official capacity.

33.    Defendant Sheriff McFadden is and was at all times relevant to this action:

    a.  in control of the MCDCC;

    b.  the final decision-making authority over law enforcement policies and staff of his office;

    c.  directly responsible for the appointment, retention, supervision and conduct of his officers, medical staff, deputies, employees and agents;

    d.  responsible for the care and control of the MCDCC;

e. responsible for the care and custody of residents detained or held in the MCDCC;

f. acting in the course and scope of his official duties as Sheriff of Mecklenburg County and under color of state law;

g. along with his agents, the keeper of the MCDCC, pursuant to N.C.G.S. § 162-55; and

h. is vicariously liable for the actions and inactions of his agents, employees, including, but not limited to, justice officers, managers, supervisors, medical staff, detention officers, and/or deputies.

34. Upon information and belief, Sheriff McFadden or the Mecklenburg County Sheriff's Office or Mecklenburg County, on the sheriff's behalf, purchased liability insurance, and/or contractually required its agents to purchase liability insurance and name Sheriff McFadden or the Mecklenburg County Sheriff's Office ("MCSO") as an additional insured, and/or invested/paid to participate in a local government risk pool that provides coverage for claims made by Plaintiff and will indemnify the Defendants, if found liable in this matter, thereby waiving any governmental immunity that might otherwise apply to the Sheriff or his agents in this action.

35. At all times relevant to this action, Defendant Ohio Casualty Insurance Company ("Ohio Casualty") was and is a surety company and serves as the surety bond holder for Sheriff McFadden, pursuant to N.C.G.S. § 58-76-5 and N.C.G.S. § 162-8.

36. Upon information and belief, Ohio Casualty, as the surety bond holder for Sheriff McFadden, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C.G.S. § 58-76-5.

37. Upon information and belief, Sheriff McFadden, on behalf of himself and his agents, waived applicable immunity by obtaining a surety bond and/or by purchasing liability insurance and/or participating in a governmental risk pool.

38. Upon information and belief, Defendant Chief Telisa White ("Chief White"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and was Chief of Detention of MCDCC assigned to oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

39. Upon information and belief, Defendant Captain Larry Houpe ("Capt. Houpe"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

40. At all times relevant to this action, Capt. Houpe was assigned as Shift Commander at MCDCC.

41. Upon information and belief, Defendant Captain Anthony Durrah ("Capt. Durrah"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and

assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

42. At all times relevant to this action, Capt. Durrah was assigned as Zone 1 Commander at MCDCC, which included Pod 2300 - the infirmary.

43. Upon information and belief, Defendant Sergeant Khrislyn Mackin ("Sgt. Mackin"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a deputy employed by Sheriff McFadden and assigned to perform and otherwise oversee resident custodial care duties within the MCDCC, including training and supervising detention staff.

44. At all times relevant to this action, Sgt. Mackin was assigned to supervise the detention staff at MCDCC working on the second floor, including the infirmary.

45. Upon information and belief, Defendant Detention Officer Tricia Beatty ("D.O. Beatty"), named in her individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

46. Upon information and belief, Defendant Detention Officer Bruce Parker ("D.O. Parker"), named in his individual capacity, is a citizen and resident of Mecklenburg County and was, at all relevant times, a sworn detention officer employed by Sheriff McFadden, and assigned to perform resident custodial care duties within MCDCC.

47. Defendants Chief White, Capt. Houpe, Capt. Durrah, Sgt. Mackin, D.O. Beatty, and D.O. Parker are collectively referred to as the "Detention Defendants".

48.  To the extent that any of the above-named Defendants is considered a public officer, his or her gross negligence dictates that public officer immunity would not apply.

**D.  DEFENDANTS RESERVE HEALTH, DR. BIONDI AND THE MEDICAL DEFENDANTS**

49.  Upon information and belief, Defendant Reserve Health, P.C. ("Reserve") contracted with Wellpath and/or Sheriff McFadden and/or Mecklenburg County to provide the services of Medical Director, medical physician services, medical nurse practitioner services, medical physician assistant services, mental health physician services and medication prescribing services for MCDCC residents.

50.  Defendant Reserve is a North Carolina corporation, licensed and doing business in Mecklenburg County, North Carolina.

51.  Defendant Reserve is sued for its own tortious wrongdoing, as well as under the theory of respondeat superior for the acts and failures to act by its employees responsible for providing medical and mental healthcare services for MCDCC residents, including Mr. Benfield.

52.  Upon information and belief, Defendant Doctor Daniel T. Biondi ("Dr. Biondi") is a resident of Mecklenburg County, North Carolina, and was, at all relevant times, a physician practicing with Reserve and employed by or contracted by Mecklenburg County and/or Sheriff McFadden to provide healthcare services to MCDCC residents. Dr. Biondi is named in his individual capacity and his official capacity as MCDCC Medical Director and owner of Reserve.

53.     At all times relevant to this action, Dr. Biondi was the Medical Director and Chief Physician of MCDCC and was charged with the supervision and oversight of the medical staff at MCDCC, including, but not limited to, the following personnel:

>       Norah Shaba, RN

>       Destini Bethea, RN

>       Aryn Graham, LPN

>       Maryah Banks, RN

>       Phydria Scott, LPN

>       Keiarra Jones, LPN

>       Tiarra Slade, LPN

54.     Upon information and belief, Defendant Nora Shaba, ("Shaba") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Registered Nurse employed to provide medical care to MCDCC residents. Shaba is named in her individual capacity.

55.     Upon information and belief, Defendant Destini Bethea, ("Bethea") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Registered Nurse employed to provide medical care to MCDCC residents. Bethea is named in her individual capacity.

56.     Upon information and belief, Defendant Aryn Graham ("Graham") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse employed to provide medical care to MCDCC residents. Graham is named in her individual capacity.

57.    Upon information and belief, Defendant Maryah Banks ("Banks") is a resident of Mecklenburg County and was, at all relevant times, employed by Supplemental Health Care and contracted with Wellpath as a Registered Nurse to provide medical care to MCDCC residents. Banks is named in her individual capacity.

58.    Upon information and belief, Defendant Phydria Scott ("Scott") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse employed to provide medical care to MCDCC residents. Scott is named in her individual capacity.

59.    Upon information and belief, Defendant Keiarra Jones ("Jones") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse employed to provide medical care to MCDCC residents. Jones is named in her individual capacity.

60.    Upon information and belief, Defendant Tiarra Slade ("Slade") is a resident of Mecklenburg County and was, at all relevant times, employed or contracted by Wellpath as a Licensed Practical Nurse employed to provide medical care to MCDCC residents. Slade is named in her individual capacity.

61.    Defendants Shaba, Bethea, Graham, Banks, Scott, Jones and Slade are collectively referred to herein as the "Medical Defendants."

62.    At all relevant times to this action the Medical Defendants were acting under the color of state law at the MCDCC.

63.    The Medical Defendants, Dr. Biondi and Reserve were exclusively responsible for providing Mr. Benfield's health care at all relevant times to this action.

64. The Medical Defendants were acting within the course and scope of their employment during their interactions with Mr. Benfield, as alleged herein.

65. At all relevant times to this action Dr. Biondi and the Medical Defendants were health care providers as defined in N.C. Gen. Stat. § 90-21.11.

66. In addition to Plaintiff's civil rights claims, Plaintiff sets forth claims of medical malpractice under North Carolina law alleging Dr. Biondi and the Medical Defendants failed to comply with the applicable standard of care under N.C. Gen. Stat. § 90-21.12(a) in their care and treatment of Mr. Benfield.

67. The medical care provided to Mr. Benfield by Dr. Biondi and the Medical Defendants, and all the medical records pertaining to the alleged negligence and gross negligence that are available to Plaintiff after reasonable inquiry, have been reviewed by a licensed nurse practitioner and a physician specializing in correctional health, who are each reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and are each willing to testify that the medical care provided by Dr. Biondi and the Medical Defendants did not comply with the applicable standard of care for such health care providers.

## FACTUAL ALLEGATIONS

68. Plaintiff incorporates the paragraphs above as if fully set forth herein.

## A. BACKGROUND INFORMATION

69. The Mecklenburg County Detention Center Central (MCDCC) was constructed in 1997 and all operations officially moved into the facility in 1997. It consists of

several administration offices, a public lobby and processing, booking, and releasing areas, a medical station, and five resident housing blocks referred to as pods.

70.     At all times herein, a person held at the MCDCC is referred to as a "resident" or collectively as "residents."

71.     By operation of North Carolina statute, the elected Sheriff, through his employees and agents, is exclusively responsible for operations of the MCDCC, including all care and supervision of residents, full oversight of resident healthcare, and full compliance with State and Federal law, the North Carolina Administrative Code and all MCDCC policies, methods, and procedures to ensure security, safety and health of all MCDCC residents, as well as the security and safety of employees and agents assigned to the MCDCC.

72.     Upon information and belief, Wellpath served as Sheriff McFadden's agent to employ and provide medical staff at the MCDCC, as proscribed under Wellpath's contract with Mecklenburg County and/or Sheriff McFadden, to provide healthcare services, including medical and mental healthcare, to MCDCC residents.

73.     Pursuant to its contract, Reserve and its agent, Dr. Biondi provided supervision of all professional medical, mental health, dental and related healthcare services for MCDCC residents, including sick calls, nursing care, physician care, medical sub-specialty services, mental healthcare, and other healthcare services based on the healthcare needs of the MCDCC residents.

74.     Upon information and belief, Dr. Biondi and Medical Defendants were, at all relevant times, responsible for executing the medical plan established by

Mecklenburg County, Defendant McFadden, Wellpath and Dr. Biondi, to provide healthcare to MCDCC residents.

75.     Upon information and belief, Sheriff McFadden and the Detention Defendants were, at all times relevant to this action, responsible for implementation of and compliance with Sheriff McFadden's policies and procedures for the MCDCC, and, with the exception of D.O. Beatty and D.O. Parker, were responsible for the training, supervision, and oversight of Sheriff McFadden's detention employees assigned to work at the MCDCC.

76.     In accordance with 10A North Carolina Administrative Code 14J ("10A NCAC 14J"), the operations of the MCDCC are governed by the following industry standards:

        a.      Appalachian State University, Model Policies and Procedures Manual for North Carolina Jails;American Correctional Association, Standards for Adult Local Detention Facilities;

        b.      American Correctional Association, Standards for Small Jails;

        c.      National Commission on Correctional Healthcare, Standards for Health Services in Jails; and

        d.      United States Marshal Service Policy Directives for the provision and management of healthcare services to prisoners in the custody of the United States Marshals Service.

77.     Under the United State Constitution and the North Carolina State Constitution Mecklenburg County and Sheriff McFadden have a non-delegable duty

to provide adequate medical care, including mental health screenings and treatment, to MCDCC residents.

78. Upon information and belief, the Mecklenburg County Sheriff's Department is accredited by the National Commission on Correctional Healthcare ("NCCHC") and, in addition to the medical standards imposed by the State of North Carolina, has otherwise agreed to maintain compliance with 100% of the essential standards established by NCCHC in the operation of MCDCC.

79. Defendant McFadden, his employees and agents, including the Detention Defendants and Medical Defendants, Reserve and Dr. Biondi, knew, or should have known, that deliberate indifference to the serious medical needs of a MCDCC resident constitutes unnecessary and wanton infliction of pain, as proscribed by the Eighth and Fourteenth Amendments to the United States Constitution, and the parallel provisions of our state constitution, as well as negligent, grossly negligent, and/or willful and wanton conduct.

80. On December 4, 2018, Defendant McFadden was sworn into office as the Sheriff of Mecklenburg County.

81. By the spring of 2024, Defendant McFadden had served as the County's elected sheriff for just over five years and during that period, under his exclusive leadership and authority, there were more than eighteen resident deaths at the MCDCC.

82. This Complaint is at least the eighth civil complaint filed as a result of yet another tragic, preventable death of a MCDCC resident whose care and well-being was entrusted to Defendant McFadden, his employees and agents.

83.   In 2019, Sheriff McFadden, with the support of Mecklenburg County, purchased and installed the most advanced, cutting-edge full-body scanner at the MCDCC in order to increase the detection and exclusion of contraband such as drugs and weapons from entering MCDCC, thereby increasing safety and security.

84.   Upon information and belief, the full-body scanner purchased by Defendant McFadden utilizes millimeter wave technology and/or X-ray technology capable of intricately capturing bodily images that successfully detect objects hidden on or within the human body.

85.   Upon information and belief, despite Defendant McFadden's stated purpose for the newly purchased full-body scanner, to significantly improve safety and security within the MCDCC, Defendant McFadden failed to mandate that he, his deputies, staff, agents or volunteers submit to the full-body scanning system before entering the MCDCC.

**B.    GEORGE BENFIELD'S HEALTH CONDITIONS**

86.   Upon information and belief, George Benfield was diagnosed with a seizure disorder, asthma, bi-polar disorder, substance abuse and addiction disorder, and post-traumatic stress disorder, each through confirmed clinical diagnoses that occurred between 2004 and 2014.

87.   A seizure disorder is diagnosed when a patient suffers recurrent seizures, which are abnormal neurological events marked by sudden repeated episodes of sensory disturbance, loss of consciousness, or convulsions caused by abnormal electrical activity in the brain.

88. Asthma is a chronic lung disease characterized by inflammation and narrowing of the airways, which leads to breathing difficulty and symptoms like wheezing, shortness of breath, chest tightness, and coughing.

89. Bi-polar disorder is a chronic mental health condition characterized by extreme shifts in mood, energy, and activity levels, causing intense highs (mania or hypomania) and lows (depression). Episodes can last for days, weeks, or months and are distinct from natural, normal changes in mood. Symptoms of Bipolar Disorder include intense sadness, lack of energy, feelings of worthlessness, or elevated moods with high energy, irritability, racing thoughts, and impulsivity.

90. Substance abuse and addiction disorder is a chronic disease of the brain that affects neurological health and function, and manifests with the inability to control the use of substances such as drugs and alcohol.

91. Post-traumatic stress disorder is a trauma- and stressor-related disorder where symptoms develop following exposure to a traumatic event, characterized by four clusters: Intrusion (flashbacks, nightmares), Avoidance (memories, reminders), Negative Alterations in Cognition & Mood (blame, detachment, loss of interest), and Alterations in Arousal & Reactivity (hypervigilance, irritability, startle response).

## C.    ARRESTS AND PROCESSING

92. On January 19, 2024, at approximately 6pm, Charlotte Mecklenburg Police took Mr. Benfield into custody on an outstanding order for arrest related to an out-of-county probation violation.

93. After searching Mr. Benfield, arresting officers recovered 4 hypodermic syringes on his person.

94. He was then transported to the Mecklenburg County Detention Center Central (MCDCC) and he entered the facility at approximately 6:45pm.

95. Mr. Benfield was then searched again by a Mecklenburg County Sheriff deputy assigned to the MCDCC Receiving Post. No contraband was found on or recovered from Mr. Benfield in that search.

96. Mr. Benfield submitted to the full-body scanning system at the MCDCC which confirmed that he was free from contraband upon his entry to the MCDCC.

97. Mr. Benfield was then navigated through the various Arrest Processing posts by MCDCC deputies.

98. During the medical screening intake process, LPN Graham and Nurse Bethea collected Mr. Benfield's medical history. Mr. Benfield reported his seizure disorder and asthma diagnoses, that he took Depakote, Remeron and Buspar, as well as medications for his mental health condition and signed a Release of Information form, allowing MCDCC medical staff to obtain his medical records.

99. Mr. Benfield disclosed to Bethea and Graham that he suffers from chronic alcohol, benzodiazepine and opiate misuse and that he was receiving Buprenorphine (8mg) treatments from Integrative Behavioral Health in Charlotte, North Carolina, that the prescription was filled by Medicap.

100. Mr. Benfield also signed a Release of Information form allowing MCDCC medical staff to obtain his medical records from Integrative Behavioral Health.

101. Mr. Benfield disclosed to Bethea and Graham that he had consumed two bottles of wine hours before, on January 18, 2025.

102. Upon information and belief, as a matter of course during the MCDCC medical intake screening, vital statistics of new arrestees are collected to determine medical eligibility and to confirm medical clearance for admission to the MCDCC.

103. Cardinal signs of life, commonly referred to as "vital signs or statistics", are the key indicators of essential bodily functions and include measurements of body temperature, pulse rate (heart rate), respiratory rate, blood pressure, and oxygen saturation.

104. At 12:06 am on January 20, 2024, Graham and Bethea measured Mr. Benfield's vital statistics which revealed the following results: body temperature: 98.3 degrees; pulse rate: 111 bpm; respiratory rate: 18 bpm; blood pressure: 110/77; and oxygen saturation: 92%.

105. At that same time, Graham and Bethea documented that Mr. Benfield was experiencing shortness of breath.

106. A urinalysis was performed to confirm Mr. Benfield's report of Buprenorphine. The results of the urinalysis confirmed the presence of Buprenorphine, as well as cocaine, Ecstasy/MDMA, Amphetamine, and Methamphetamine.

107. According to MCDCC records, following the results of Mr. Benfield's urinalysis, Dr. Biondi consulted with LPN Graham and Nurse Bethea, via phone, on Mr. Benfield's care and he authorized medical clearance for Mr. Benfield's admission to

MCDCC, instructing that Mr. Benfield be assigned to the MCDCC infirmary housing unit under detoxification protocol, and under unspecified COWS and CIWA protocol.

108. COWS is the acronym that represents a clinical assessment tool, the Clinical Opiate Withdrawal Scale, used by healthcare clinicians to assess the severity of opioid withdrawal in patients who are newly admitted to healthcare facilities. The protocol requires that a clinically tailored patient care plan be implemented in order to ensure closely managed and safe patient care throughout a forecasted period of withdrawal.

109. CIWA protocol is an acronym that represents a clinical assessment tool, the Clinical Institute Withdrawal Assessment for Alcohol Withdrawal Scale, used by healthcare clinicians to assess the severity of alcohol withdrawal in patients who are newly admitted to healthcare facilities. The protocol requires that a clinically tailored patient care plan be devised by a physician to determine needs, including medication intervention, and to properly and closely manage symptoms in order to prevent complications, including death.

## D. INFIRMARY UNIT

110. At 1:43am on January 20th, a MCDCC deputy escorted Mr. Benfield from Arrest Processing to Pod 2300, the infirmary housing unit.

111. At that time, D.O. Beatty was responsible for the detention care, oversight and supervision of infirmary residents.

112. At that time, Nurse Shaba was responsible for medical oversight and care of infirmary residents.

113.    Upon his arrival to the infirmary unit, the care of Mr. Benfield was turned over to Beatty and Shaba.

114.    Beginning at 1:47:25 am, MCDCC surveillance footage from the infirmary captured Nurse Shaba initiating the collection of Mr. Benfield's vital statistics including measuring Mr. Benfield's body temperature, pulse rate, respiratory rate, blood pressure and oxygen saturation.

115.    Despite video evidence confirming Nurse Shaba's collection of Mr. Benfield's vital statistics, no medical record was created and therefore Shaba failed to document the results of the 1:47 am vital statistics collection.

116.    Nurse Shaba documented that she received verbal orders that Mr. Benfield's medical care was to be provided under COWS and CIWA protocols but did not include any details about his personal protocol.

117.    Mr. Benfield asked about his legal paperwork he left in booking and at approximately 1:50am, MCDCC surveillance camera footage captured Mr. Benfield walking toward cell #10, entering the cell and closing the door.

118.    At 1:51:29 am, D.O.  Beatty began a supervisory tour of the infirmary, completed the supervisory tour at 1:53:48 am and returned to her desk.

119.    At 2:16:40 am, D.O. Beatty initiated a supervisory tour. During that tour, she did not use a flashlight to look into the dark, unlit infirmary cells and MCDCC surveillance camera footage captured D.O. Beatty talking on her cell phone before, during and after the supervisory tour which she ended shortly before 2:19 am.

120.   During her 2:16 am supervisory tour, Defendant Beatty did not look into, enter or otherwise make any contact with Mr. Benfield in cell #10.

121.   Between 2:16 and 2:34 am, both D.O. Beatty and Nurse Shaba remained seated at their respective desks.

122.   At approximately 2:34:31 am, D.O. Beatty stood up and stepped away from her desk, exited the view of the camera briefly, then reappeared with paperwork in her hand and walked toward cell #10 arriving at the door at approximately 2:35:02 am.

123.   D.O. Beatty opened the slot in the door of cell #10, paused for several seconds and then opened the door to cell #10 with paperwork in her hand.

124.   Beatty held the door to cell #10 open with her foot and briefly leaned into cell #10, then leaned back, and the paperwork was no longer in her hand.

125.   D.O. Beatty then closed the door to cell #10 but continued to grip the exterior handle of the door and leaned on the door frame as she gazed into the cell through the window.

126.   MCDCC surveillance camera footage captured D.O. Beatty continuing to look into cell #10, and she repositioned herself a few times before she turned and walked to the infirmary nurse's station where Nurse Shaba was seated.

127.   When D.O. Beatty reached the infirmary nurse's station at 2:36:25 am, she walked up to Nurse Shaba and began talking to her and gestured toward cell #10.

128.   Seconds later, still while she talked with Nurse Shaba, MCDCC surveillance camera footage captured D.O. Beatty bending over at the waist, appearing to demonstrate to Nurse Shaba, a physical position known as an "fentanyl fold".

129.   After D.O. Beatty stood up from her folded position, she continued to talk to Nurse Shaba as the two exited the nurse's station and walked toward cell #10.

130.   Although D.O. Beatty and Nurse Shaba both walk toward cell #10, Nurse Shaba's pace was noticeably slower, as her difficulty ambulating prevented her from keeping pace with Beatty, and she trailed behind D.O. Beatty as the two walked.

131.   At 2:37:29, when D.O. Beatty and Nurse Shaba both reached the door of cell #10, both peered into the window of the cell and appeared to observe Mr. Benfield, though neither used a flashlight nor turned on the lights to see inside of cell #10.

132.   Fifteen seconds later, Nurse Shaba turned and began to walk back to the nurse's station.

133.   At 2:37:57 am, D.O. Beatty stopped her observation of Mr. Benfield and like Shaba, Beatty turned and walked toward the nurse's station.

134.   While D.O. Beatty and Nurse Shaba walked away from cell #10, back toward the nurse's station, MCDCC surveillance camera footage captured D.O. Beatty, twice, engaged in physical positioning whereby she went from a fully upright, standing position, to folding the upper half of her body over the lower half of her body, appearing to demonstrate to Nurse Shaba the physical positioning known as an "fentanyl fold", including emulating the often accompanied startle reflex that occurs before full collapse during such a fold.

135.   Nurse Shaba continued to walk toward the nurse's station while she observed D.O. Beatty's demonstrations.

136.   Nurse Beatty arrived back at her seat at the nurse's station at 2:38:31 am and appeared to make a remark to D.O. Beatty, to which Beatty nodded before arriving at her own desk.

137.   At 2:40:34 am, during what appears to be a supervisory pod tour, D.O. Beatty walked by cell #10, glanced at the window to the cell, but did not stop or enter the cell, and instead walked past it and returned to her desk at 2:42:37 am.

138.   At 3:00:41 am, D.O. Beatty stood up from the chair at her desk and began a supervisory pod tour.

139.   At 3:01:22 am, as D.O. Beatty approached the door of cell #10, she turned left and walked down the hallway and passed by cell #10 without stopping or looking into it.

140.   At 3:02:21 am, MCCDC surveillance camera footage captured D.O. Beatty's return to cell #10 where she unlocked and opened the door and propped the door open with her foot while she stood in the doorway until 3:03:55 am, when she briefly stepped out of the cell, flipped a switch, and caused cell #10 to illuminate.

141.   D.O. Beatty then leaned back into cell #10 and held onto the door frame until MCDCC surveillance camera footage captured her step out from the doorway and close the door to cell #10 at 3:04:30 a.m.

142.    D.O. Beatty then locked the door to cell #10, walked back toward the nurse's station, stopping along the way to press the supervisory tour button in order to capture and record the completion of a supervisory tour.

143.    When D.O. Beatty reached the nurse's station at 3:04:57 a.m., she addressed Nurse Shaba and conversed with her as D.O. Parker entered Pod 2300 at 3:05:19 a.m.

144.    At 3:05:26 a.m., MCDCC surveillance camera footage captured D.O. Beatty and Parker walking toward cell #10 while Nurse Shaba remained seated at the nurse's station where she had remained for nearly 30 minutes since returning at 2:38 a.m.

145.    When D.O. Beatty and Parker arrived at cell #10 at 3:05:45 a.m., Beatty fumbled with keys and was unable to open the door to cell #10, so she turned and walked back toward the nurse's station while D.O. Parker peered through the window into cell #10.

146.    At 3:06:10 a.m., Nurse Shaba exited the nurse's station and walked toward cell #10 as D.O Beatty began to pass the nurse's station on her way back toward her own desk.

147.    At 3:06:20 a.m., D.O. Beatty grabbed an object from her desk, turned and walked back toward cell #10 where D.O. Parker continued to stand outside the door.

148.    At 3:06:34 a.m., Nurse Shaba eventually reached the door to cell #10 and when she did, neither she nor D.O. Parker entered cell #10, but instead just peered through the window and looked into the cell while D.O. Beatty continued to walk from her desk toward them.

149. When D.O. Beatty arrived and unlocked the door to cell # 10, she and Nurse Shaba entered the cell, followed by D.O. Parker.

150. D.O. Beatty and Parker put Mr. Benfield, who was seated on the bed and folded forward over his legs, onto the floor.

151. A few seconds later, Nurse Shaba exited cell #10 and began to walk, with the same labored gate, toward the nurse's station. No one administered any life-saving measures or medical intervention to Mr. Benfield.

152. As Nurse Shaba walked, MCDCC video surveillance footage captured D.O. Beatty and Parker, standing within the cell, looking down, with no movement or indication that either officer began CPR or any other life-saving measures on Mr. Benfield.

153. When Nurse Shaba arrived at the nurse's station, she opened a drawer, and removed an object that, upon information and belief, was a locked container that held naloxone.

154. Naloxone is a life-saving opioid antagonist medication that rapidly reverses the effects of an opioid overdose, such as slowed or stopped breathing, by blocking opioid receptors in the brain. It is commonly administered nasally, through an inhalant device. As an opioid antagonist that arrests and blocks the effects of opioids on the brain, when administered timely, naloxone restores normal breathing within two to three minutes and prevents death from opioid overdose.

155. MCDCC video surveillance footage captured that Nurse Shaba struggled to open the container as D.O. Beatty exited cell #10 and began to walk toward the

nurse's station and D.O. Parker stood in the doorway of the cell, looking down toward the cell floor. None of the three administered any life-saving measures to Mr. Benfield.

156. By 3:08:02 a.m., Nurse Shaba still struggled with the container at the nurse's station, D.O. Parker remained standing in the cell door looking toward the cell floor and D.O. Beatty walked past her desk and through a door at the opposite end of the infirmary unit from cell #10. None of the three were administering any life-saving measures to Mr. Benfield.

157. At 3:08:21 a.m., Nurse Shaba finally opened the container just as D.O. Beatty was walking in front of and within arm's reach of Nurse Shaba. Even though D.O. Beatty was headed back to cell#10, Nurse Shaba did not hand D.O. Beatty the naloxone.

158. Although she opened the container, Nurse Shaba was unable to immediately locate naloxone and sorted through the container and moved objects around before she grabbed an object, closed the container and locked it at 3:08:35 a.m. Upon information and belief, the object Nurse Shaba withdrew from the container was a canister of naloxone.

159. Despite locating the naloxone, Nurse Shaba did not immediately return to cell #10 to administer it to Mr. Benfield, but instead she moved to the other side of the nurse's station, fumbled around and then made a phone call.

160. According to Nurse Banks, Nurse Shaba dialed the medical screening post within Arrest Processing and reported to Nurse Banks that she needed assistance with a patient in the infirmary.

161. Nurse Banks documented that Nurse Shaba requested assistance, but that Banks reported to Shaba that she was unable to assist due to awaiting the arrival of EMS for another MCDCC patient.

162. D.O. Beatty and Parker stood in the doorway of cell #10, looking down at the cell's floor, and intermittently paced in and out of the cell while Nurse Shaba called Nurse Banks. None of the three had yet to administer any life-saving measures to Mr. Benfield.

163. At 3:09:21 a.m., D.O. Beatty was outside of cell #10, making a phone call, while D.O. Parker continued to stand in the doorway and Nurse Shaba remained at the nurse's station.

164. At 3:09:45 a.m., Nurse Shaba exited the nurse's station and began to walk toward cell #10, while D.O. Beatty stood outside of the cell and D.O. Parker stood inside. None of the three were administering any life-saving measures to Mr. Benfield.

165. At 3:10:00 a.m., Nurse Shaba arrived at the door of cell #10, naloxone in hand and D.O. Parker exited the cell and the three appeared to have a brief verbal exchange. None of the three were administering any life-saving measures to Mr. Benfield.

166.   In those moments, Nurse Shaba never entered the cell, nor did she hand the naloxone to either of the detention officers, but instead, five seconds later, at 3:10:05 a.m., Nurse Shaba turned, with the naloxone in her hand, and began walking away back toward the nurse's station. None of the three were administering any life-saving measures to Mr. Benfield.

167.   As Nurse Shaba walked with her labored gait back to the nurse's station, D.O.'s Beatty and Parker continued to stand, pace and mill about the doorway of cell #10.

168.   At 3:10:27 a.m., Nurse Shaba picked up the phone at the nurse's station and dialed it.

169.   For the next thirty seconds, Nurse Shaba can be seen on the phone at the nurse's station while D.O. Beatty and Parker are standing inside of cell #10 looking toward the floor of the cell. None of the three were administering any life-saving measures to Mr. Benfield.

170.   At 3:11:02 a.m., D.O. Parker exited cell #10, called out to Nurse Shaba and with his hand, gestured for her to return to the cell and Nurse Shaba responded by exiting the nurse's station at 3:11:10 a.m.

171.   With her labored gait, Nurse Shaba walked back toward cell #10 and as she approached the cell, video camera footage captured D.O. Parker watching what appears to be chest compressions being administered by D.O. Beatty at 3:11:15 am, at least more than 35 minutes after Mr. Benfield's initial medical distress was observed.

172.    When Nurse Shaba arrived at cell #10 at 3:11:23 a.m., D.O. Beatty had applied 12 chest compressions to Mr. Benfield.

173.    As soon as Nurse Shaba entered cell #10, D.O. Beatty ceased applying chest compressions to Mr. Benfield.

174.    According to Nurse Shaba, shortly after entering cell #10, she attempted to administer naloxone to Mr. Benfield, but he remained unresponsive.

175.    At 3:12:29 a.m., when D.O. Beatty exited cell #10 and walked to her desk, D.O. Parker and Nurse Shaba remained in the cell and additional MCDCC detention staff arrived at the infirmary and walked toward cell #10.

176.    Upon information and belief, Sgt. Mackin, Sgt. Turner, Sgt. Lackey, Capt. Van Allen, Capt. Durrah, and Capt. Houpe were the MCDCC supervisory leadership who arrived at the infirmary around 3:12 a.m. in response to a facility-wide 10-18 medical emergency alert.

177.    Upon information and belief, Sgt. Mackin issued orders to D.O. Beatty upon her arrival to Pod 2300.

178.    Upon information and belief, the remaining MCDCC supervisory leadership in the pod began issuing orders to other staff members and communicating via text messaging and making calls, using handheld electronic devices.

179.    At 3:13:07 a.m., MCDCC health care staff began to arrive at Pod 2300 while D.O. Beatty was at her desk, writing.

180.    As three members of MCDCC health care staff, Nurse Banks, Nurse Scott and Nurse Jones, walked toward cell #10, pushing a mobile crash cart, members of

MCDCC detention and supervisory staff yielded and stepped away from the doorway to cell #10.

181. Nurse Banks reported that while she was on her way to the infirmary, she heard the 10-18 facility-wide alert for a medical emergency. She documented that when she arrived at cell #10, that Mr. Benfield was on the floor in a pool of clear liquid and his body was both pale and stiff.

182. According to Nurse Scott, when she arrived at cell #10, Nurse Shaba was administering chest compressions to Mr. Benfield and Scott documented that "then oxygen was started AED". Scott further documented that she took over for Nurse Shaba in administering chest compressions and that Narcan (naloxone) was administered at 3:15 am followed by vomit emitting from Mr. Benfield.

183. Nurse Jones documented that when she arrived at cell #10, Mr. Benfield was on the ground on his back and his body was stiff, that nurses were attempting to measure Mr. Benfield's vital signs and that Mr. Benfield was unresponsive to the two attempts to administer Narcan (naloxone).

184. A short time later Nurse Slade and Nurse Bethea arrived. According to Nurse Slade, when she arrived in cell #10, four nurses were present in the cell, and despite receiving CPR compressions and rescue breaths from the air bag, Mr. Benfield remained pulseless.

185. According to notes documented by Banks, she took a turn giving CPR on Mr. Benfield and LPN Scott started breaths with an ambu-bag and oxygen. Banks wrote that after 10 minutes of chest compressions, vomit began to emit from Mr. Benfield's

mouth and nose and wrote that Mr. Benfield was turned and the vomit was suctioned from his mouth and nose. She documented that chest compressions continued to be administered by rotating nurses until EMS arrived but failed to note whether any member of the MCDCC medical team ever took steps to ensure that Mr. Benfield's airway was clear.

186.    Nurse Bethea reported that when she arrived at cell #10 in response to the 10-18 alert, four nurses were present and that Mr. Benfield was receiving CPR compressions, rescue breaths and that the AED monitor was attached. Bethea made the note, "captured vital signs and blood glucose", but made no record or note documenting the measurement of any of Mr. Benfield's vital signs and did not document which member of the medical personnel successfully collected any vital signs while Mr. Benfield was in cell #10.

187.    While Nurse Bethea reported that she got the suction unit ready, she failed to document whether she, or any member of the MCDCC medical team treating Mr. Benfield, cleared his airway.

188.    Nurse Slade attempted to use the suction unit on Mr. Benfield but did not clear the vomit from his airway and stopped using it without realizing it was improperly assembled.

189.    When interviewed about incident in cell # 10, Bethea reported Mr. Benfield's body temperature as "chilly" upon her arrival to cell #10.

190.   When Mecklenburg Medic Paramedics, Samantha Walker and Kimberly Ward arrived at the infirmary at 3:21:26 a.m., Captain Van Allen directed the two to cell #10.

191.   Paramedic Walker reported that when she arrived in cell #10, Mr. Benfield was unconscious on the floor of the cell and that medical staff member was administering chest compressions on Mr. Benfield.

192.   Paramedic Walker reported that Mr. Benfield's body was "cool to the touch", that he "looked like he'd been down for a bit" and that that there was pale orange vomit on the floor near him.

193.   Paramedic Walker further reported that she removed the AED leads that had been attached to Mr. Benfield's chest and replaced them with the leads for an AED issued to Mecklenburg Medic and that she also applied a cardiac monitor. The cardiac monitor revealed that Mr. Benfield was asystole and continued to report the asystole result throughout her encounter with Mr. Benfield. Walker reported that no one treating Mr. Benfield ever detected a pulse.

194.   Paramedic Walker quickly initiated steps to clear Mr. Benfield's airway in order to properly prepare for the administration of air into his lungs.

195.   With the insertion of an airway device called an I-gel, Walker discovered that Mr. Benfield's oropharynx, his airway, was blocked and was completely full of vomit, preventing him from receiving air.

196.   Paramedic Walker reported that she observed an improperly assembled suctioning unit lying next to Mr. Benfield and that it appeared that MCDCC medical

staff attempted to use the unit, but because they failed to install the "Yonker", the component that creates suction, the device was inoperable.

197.    Walker confirmed that when she examined Mr. Benfield, there was a "significant amount of vomit" obstructing his airway and that it took some time to remove the vomit with her suction unit in order for her to begin attempts at ventilation so that Mr. Benfield could successfully receive oxygen.

198.    Walker reported that CPR with ventilation was continued by her and Paramedic Ward, but to no avail. She further confirmed that she administered epinephrine, but Mr. Benfield was non-responsive. Walker confirmed that Mr. Benfield was never conscious, never breathed and never emitted a pulse while in her care.

199.    Walker and Ward began the transport of Mr. Benfield from cell #10 to Atrium Main Emergency Department at 3:42 a.m. on January 20th and continued to monitor Mr. Benfield's vitals which did not change during his transport to the hospital.

200.    At 3:37:30 a.m., D.O. Beatty was approached by a female MCDCC sergeant and after a brief verbal exchange, Beatty departed from her desk and began what appears to be, a supervisory pod tour of the cells located on the right -hand side of the infirmary.

201.    With Captain Van Allen present, as well as three other male MCDCC captains and/or sergeants, D.O. Beatty briskly walked down the right side corridor of the infirmary and she  never stopped near, looked into or even turned toward, any of the

cells, before she pressed the supervisory pod tour button on the wall and returned, just 20 seconds later, to her desk where MCDCC leadership remained standing.

202. Throughout that same period, with Captain Van Allen present, as well as Sgt. Mackin, Sgt. Turner, Sgt. Lackey, Capt. Durrah, and Capt. Houpe, and other MCDCC detention officers, never did D.O. Beatty perform a supervisory pod tour on any of the residents who are housed in the cells along the left side corridor of the infirmary.

203. At no time from their initial arrival to the infirmary to their eventual departure from it, did Sgt. Mackin, Sgt. Turner, Sgt. Lackey, Capt. Van Allen, Capt. Durrah, or Capt. Houpe ever perform a supervisory pod tour of the infirmary residents on January 20, 2024.

204. At no time from his initial arrival to the infirmary on January 20, 2024, to his eventual departure from it, did D.O. Parker perform a supervisory pod tour of infirmary residents, nor did any of his other detention officer colleagues.

205. Mecklenburg Medic delivered Mr. Benfield to Atrium Main Emergency Department at 3:56 a.m., where the emergency department medical team took over attempts at resuscitation.

206. After Mr. Benfield continued to fail to respond to chest compressions, and intubation, attending physician, Dr. Margaret Lewis, determined that continued compressions were futile and resuscitation efforts were terminated.

207. Mr. Benfield was pronounced dead at Atrium Emergency Department at 4:06 a.m. on January 20, 2024.

208. Autopsy and toxicology results following Mr. Benfield's death conclude that Mr. Benfield suffered cardiac arrest and died as a result of fentanyl toxicity.

209. On January 20, 2024, Mr. Benfield died as a direct and proximate result of the wrongful actions and inactions of all Defendants. If Defendants had prevented illicit, lethal substances from being brought into MCDCC and/or if Defendants had obtained and/or provided appropriate medical attention and the timely emergency medical care he required before 2:45 a.m. on January 20, 2024, Mr. Benfield would likely be alive.

210. At all times relevant to the allegations in this Complaint, all Defendants, jointly and severally, acted or failed to act, under color of state law.

211. Having taken custody of George Benfield under circumstances that deprived him of his normal opportunities for self-protection, Sheriff McFadden, his employees and agents, created a special relationship with Mr. Benfield during his January 2024 residency at MCDCC.

212. The wrongful acts and omissions of each defendant combined and cooperated with the negligence of the other defendants, as alleged herein, to cause Mr. Benfield's death.

213. Upon information and belief, the following people have also died while in the care, custody and safekeeping of Defendant McFadden, his staff and/or agents as a result of McFadden and his staff/agents improperly monitoring and supervising MCDCC residents, improperly training and supervising MCDCC supervisors, detention officers and others assigned to work in the MCDCC, failure to comply with

North Carolina statutes and/or administrative codes and/or failure to provide adequate general or emergency medical or mental healthcare for MCDCC residents including:

*Kenneth Bingham*

*Russell Fincham*

*Derrick Geter*

*Karon Golightly*

*Karla Griffin*

*John Devin Haley*

*Elijah Kelly*

*Francine Laney*

*Michael Mangan*

*Jemarcus McIlwaine*

*Bryon Miller*

*Renny Mobley*

*William Rhinesmith*

*Jerome Thompson*

*Michael Trent*

*Desmond Whisnant*

214. The deaths cited above have each contributed to the MCDCC being among North Carolina's deadliest detention facilities since Sheriff McFadden's initial swearing into the office in 2018.

## FIRST CLAIM FOR RELIEF

## (Deliberate Indifference to Serious Medical Needs by Individual Defendants)

215.    Plaintiff incorporates the paragraphs above as if fully set forth herein.

216.    George Wesley Benfield was a pretrial detainee while he was in custody of the Mecklenburg County Sheriff from January 19, 20204 through January 20, 2024.

217.    As a pretrial detainee at MCDCC, Mr. Benfield had substantive due process rights under the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

218.    At the time of his January 19, 2024, admission and throughout his detention at MCDCC, Mr. Benfield was at high risk of alcohol and opiate withdrawal syndromes, overdose, seizure, respiratory failure, and cardiac arrest

219.    Defendants failed to communicate timely and properly with one another regarding Mr. Benfield's serious medical conditions and presentation and instead allowed his condition to deteriorate and lead to fatal cardiac arrest.

220.    Detention supervisors Chief White, Capt. Houpe, Capt. Durrah and Sgt. Mackin did not properly supervise D.O. Beatty and D.O. Parker to ensure they properly responded to the serious medical needs of Mr. Benfield while at MCDCC in January 2024.

221.    By 2:35 a.m. on January 20, 2024, it was clear that Mr. Benfield was in medical distress due to his non-responsive state and his position with his upper body folded over his legs and his arms hanging down.

222. By 3:02 a.m. on January 20, 2024, it was clear that Mr. Benfield's medical condition was worsening and that he was experiencing an overdose with related health complications.

223. Severe drug intoxication or overdose is a serious medical need that can become a life-threatening condition that can cause serious physical and mental harm if not properly treated.

224. Dr. Biondi and Medical Defendants failed to recognize and ensure that Mr. Benfield received the proper clinical assessment and treatment when they discovered and were aware of his clinical condition.

225. Mr. Benfield's serious medical need was so obvious that even a lay person would have easily recognized that he needed medical attention or treatment.

226. Dr. Biondi and Medical Defendants should have known of Mr. Benfield's serious medical need and the associated risk of death and acted accordingly. *See Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023).

**A.     Booking and Admission – Defendants Graham, Bethea and Biondi**

227. Defendants Graham and Bethea directly observed Mr. Benfield during the time they completed the thirteen page Receiving Screening form on January 19, 2024 and took Mr. Benfield's vitals at 12:06 a.m. on January 20, 2024.

228. At the time Defendants Graham and Bethea took Mr. Benfield's vitals, they knew his oxygen saturation level was low and his pulse rate was high.

229. Upon receipt of the result of Mr. Benfield's urine screen, Defendants Graham and Bethea knew that Mr. Benfield had Buprenorphine, as well as cocaine, Ecstasy/MDMA, Amphetamine, and Methamphetamine in his system.

230. Upon information and belief, Defendants Graham and Bethea contacted Dr. Biondi by phone on January 20, 2024 and provided him with the information regarding Mr. Benfield's Receiving Screening, his vitals taken at 12:06 a.m. and the results of Mr. Benfield's urine screen.

231. Based upon the information he received from Defendants Graham and Bethea, Defendant Dr. Biondi knew or should have known Mr. Benfield's his oxygen saturation level was low and his pulse rate was high, he had ingested illicit drugs at or around the time of his arrest, that he had consumed a large quantity of alcohol within 24 hours of his arrest and drank daily, that he was prescribed suboxone, that he struggled with medication compliance and due to his mental health and medical diagnoses, he was likely to seek illicit drugs and/or suffer withdrawal syndrome.

232. Defendants Graham, Bethea and Biondi knew or should have known that illicit drugs that were readily available in the MCDCC.

233. Defendants Graham, Bethea and Biondi were each aware or should have been aware that Mr. Benfield had serious medical needs and that he presented with a medical history and clinical symptoms indicating his serious medical distress would likely worsen with time if his condition was not treated.

234.    Defendants Graham, Bethea and Biondi knew that Mr. Benfield's medical condition required medical attention and that substantial risks of serious harm existed to Mr. Benfield if his condition was not treated.

235.    Defendant Biondi ordered that Mr. Benfield be assigned to the infirmary but did not provide directions about the specific CIWA and COWS protocol for Mr. Benfield.

236.    Defendants Graham, Bethea and Biondi consciously or recklessly disregarded the substantial risks of serious harm to Mr. Benfield by:

    a.  Failing to recognize Mr. Benfield's medical ineligibility for admission to MCDCC and permitting him to be admitted;

    b.  Failing to have Mr. Benfield seen, in person, by a medical provider with prescribing authority;

    c.  Failing to collect his vital signs between 12:06 a.m. and his transfer to the infirmary at approximately 1:50 a.m.;

    d.  Failing to communicate the basis of Mr. Benfield's serious medical needs to Defendant D.O. Beatty and Defendant Shaba;

    e.  Failing to review and consider Mr. Benfield's available medical records upon, during and after his admission to the MCDCC between January 19th and 20th, 2024;

    f.  Failing to refer Mr. Benfield for emergency medical services;

    g.  Failing to provide any medical treatment or care for Mr. Benfield; and

h. Otherwise neglecting Mr. Benfield and failing to treat his medical condition.

237. Defendants Graham, Bethea and Biondi were acting under color of state law during their care of Mr. Benfield at MCDCC.

238. Defendants Graham, Bethea and Biondi each acted with deliberate indifference to the serious medical needs of Mr. Benfield.

239. The medical care provided by Defendants Graham, Bethea and Biondi was a gross violation of the accepted standards of practice and was so grossly incompetent and inadequate as to shock the conscious and be intolerable to fundamental fairness.

240. Defendants Graham, Bethea and Biondi are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Benfield's substantive due process rights.

**B.    Infirmary – Defendants Shaba, White, Houpe, Durrah, Mackins, Beatty and Parker**

241. At around 1:43 a.m. on January 20, 2024, Mr. Benfield was escorted to the infirmary where Defendant Shaba was assigned to provide medical supervision and care, and Defendant D.O. Beatty was assigned to provide detention supervision and care to the residents there.

242. Defendants Capt. Houpe and Sgt. Matkins were assigned to supervise D.O. Beatty and Parker.

243. Defendant Shaba and Beatty knew or should have known that each resident in the infirmary pod had serious medical needs.

244. When Mr. Benfield arrived, Defendant Shaba did not record Mr. Benfield's vital signs, nor did she record his vital signs at any time while responsible for his medical care in the infirmary.

245. In the early morning hours of January 20, 2024, Defendant Beatty conducted supervisory rounds without using a flashlight or even pausing to look into each cell to determine that residents, including Mr. Benfield, were breathing.

246. Despite having the ability to observe D.O. Beatty as she performed her supervisory rounds, Sgt. Mackin did not intervene and direct her to perform them correctly, especially given the serious medical needs of the residents under her care.

247. Upon delivering paperwork to Mr. Benfield in his cell at 2:35 a.m., Defendant Beatty became aware or strongly suspected that Mr. Benfield was in medical distress and had a serious medical need when she saw him seated on his bed and folded over toward the floor.

248. Despite reporting her concerns to Defendant Shaba, neither Defendant Shaba nor Defendant Beatty entered Mr. Benfield's cell to check on him or even turned on the light inside to better observe him.

249. Defendants Beatty and Shaba left Mr. Benfield to suffer in his cell despite knowing of Mr. Benfield's serious medical need.

250. Defendants Beatty and Shaba failed to respond to Mr. Benfield's serious medical needs despite their actual knowledge of the risks of harm, or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.

251.  Nearly thirty minutes later, Defendant Beatty opened Mr. Benefield's cell door, but does not enter, despite finding Mr. Benfield in the same position and unresponsive.

252.  Several minutes later Defendants Beatty and Shaba are joined by Defendant Parker, and despite finding Mr. Benfield unresponsive, they did not immediately send a 10-18 medical emergency alert to the rest the MCDCC staff.

253.  Defendants Beatty and Parker did nothing for over five minutes to enlist emergency medical care for Mr. Benfield.

254.  Defendant Shaba consciously disregarded the substantial risks of serious harm to Mr. Benfield by:

   a.  Failing to assess his condition and prepare a plan of care, including have Narcan ready for immediate use;

   b.  Failing to take and/or record his vital signs;

   c.  Failing to document Mr. Benfield's condition;

   d.  Failing to medically monitor his detoxification;

   e.  Failing to immediately place an emergency call for help the first time she saw Mr. Benfield folded over and unresponsive;

   f.  Failing to administer aid to Mr. Benfield the first time she saw him folded over and unresponsive;

   g.  Failing to immediately place an emergency call for help the second time she saw Mr. Benfield folded over and unresponsive;

   h.  Failing to know how to quickly open the container holding the Narcan;

i. Failing to immediately administer Narcan to Mr. Benfield;

j. Failing to call for emergency medical assistance when Nurse Banks was unable to immediately respond to help; and

k. Otherwise neglecting Mr. Benfield and failing to respond to his emergency medical needs.

255. Defendant Beatty consciously disregarded the substantial risks of serious harm to Mr. Benfield by:

a. Failing to adequately monitor Mr. Benfield despite his serious medical need;

b. Failing to ask Defendant Shaba to enter Mr. Benfield's cell and check his vitals or otherwise address his obvious serious medical need;

c. Failing to call for emergency medical care or take any action for Mr. Benfield's health, safety and welfare the first time she saw he was unresponsive, and Nurse Shaba failed to do so;

d. Failing to check on Mr. Benfield during her 2:40 a.m. supervisory round;

e. Waiting 30 minutes to check on Mr. Benefield after first finding him folded over and unresponsive;

f. Failing to immediately call for emergency medical care for Mr. Benfield the second time she saw he was unresponsive at 3:02 a.m.; and

g. Otherwise neglecting Mr. Benfield and failing to respond to his emergency medical needs.

256.   The nursing care provided by Defendant Shaba was a gross violation of the accepted standards of practice and was so grossly incompetent and inadequate as to shock the conscious and be intolerable to fundamental fairness.

257.   Defendants Beatty and Parker consciously disregarded the substantial risks of serious harm to Mr. Benfield by:

   a.  Failing to immediately call for emergency medical care for Mr. Benfield when both could see Mr. Benfield had emergency medical needs and that Defendant

   b.  Shaba was not capable of moving quickly in an emergency situation;

   c.  Failing to call for emergency medical care for Mr. Benfield when Nurse Shaba failed to do so;

   d.  Failing to assist with giving Mr. Benfield CPR until help could arrive; and

   e.  Otherwise neglecting Mr. Benfield and failing to respond to his emergency medical needs.

258.   Defendants Shaba, Beatty and Parker were acting under color of state law during their care of Mr. Benfield at MCDCC.

259.   Defendants Shaba, Beatty and Parker each acted with deliberate indifference to the serious medical needs of Mr. Benfield.

260.   Defendants Shaba, Beatty and Parker are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Benfield's substantive due process rights.

261. At all relevant times in this action, Defendants White, Houpe, Durrah, and Mackin were responsible for providing training, supervision and oversight of detention officers at MCDCC.

262. Defendants White, Houpe, Durrah, and Mackin consciously disregarded the substantial risks of serious harm to residents with serious medical needs, like Mr. Benfield, by failing to properly train D.O. Beatty regarding her duties when she was assigned to the infirmary.

263. Defendants White, Houpe, Durrah, and Mackin consciously disregarded the substantial risks of serious harm to residents with serious medical needs, like Mr. Benfield, by failing to supervise D.O. Beatty while she was assigned to the infirmary.

264. Defendants White, Houpe, Durrah, and Mackin were acting under color of state law during their care of Mr. Benfield at MCDCC.

265. Defendants White, Houpe, Durrah, and Mackin each acted with deliberate indifference to the serious medical needs of Mr. Benfield.

266. Defendants White, Houpe, Durrah, and Mackin are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Benfield's substantive due process rights.

## C. Emergency Medical Care – Defendants Banks, Scott, Jones, Slade and Bethea

267. At approximately 3:11 a.m. on January 20, 2024, Defendants Banks, Scott, Jones, Slade and Bethea responded to the infirmary in response to the facility-wide 10-18 medical emergency call.

268. Defendants Banks, Scott, Jones, Slade and Bethea entered Mr. Benfield's cell and observed his emergency medical condition.

269. While Defendants Banks, Scott, Jones, Slade and Bethea engaged in assisting with giving CPR and emergency breaths to Mr. Benfield, none of them determined whether his airway was clear.

270. When Defendants Banks, Scott, Jones, Slade and Bethea saw Mr. Benfield vomit, none of them properly assembled the suction unit.

271. When Defendant Betha improperly assembled the suction unit, Defendants Banks, Scott, Jones and Bethea did not notice or attempt to fix the assembly of the suction unit.

272. Although Defendant Slade tried to use the suction unit, she did not recognize that it was improperly assembled and was not working to clear the vomit from Mr. Benfield's airway.

273. Defendant Slade stopped using the suction unit without clearing Mr. Benfield's airway and made no other effort to clear his airway with her fingers.

274. When EMT Ward and EMT Walker arrived, Defendants Banks, Scott, Slade and Bethea stopped providing CPR and EMT Ward and EMT Walker had to ask them to resume CPR.

275. EMT Walker noticed that the suction unit was not properly assembled and was ineffective in removing the vomit from Mr. Benfield's airway.

276. Defendants Banks, Scott, Jones, Slade and Bethea consciously disregarded the substantial risks of serious harm to Mr. Benfield by:

a. Failing to properly assemble the suction unit;

b. Failing to clear Mr. Benfield's airway;

c. Failing to properly give Mr. Benfield emergency breaths;

d. Failing to continue to give CPR until relieved from this duty; and

e. Otherwise neglecting Mr. Benfield and failing to respond to his emergency medical needs.

277. Defendants Banks, Scott, Jones, Slade and Bethea were acting under color of state law during their care of Mr. Benfield at MCDCC.

278. Defendants Banks, Scott, Jones, Slade and Bethea each acted with deliberate indifference to the serious medical needs of Mr. Benfield.

279. The medical care provided by Defendants Banks, Scott, Jones, Slade and Bethea was a gross violation of the accepted standards of practice and was so grossly incompetent and inadequate as to shock the conscious and be intolerable to fundamental fairness.

280. Defendants Banks, Scott, Jones, Slade and Bethea are liable to Plaintiff pursuant to 42 U.S.C. § 1983, for the violation of Mr. Benfield's substantive due process rights.

## SECOND CLAIM FOR RELIEF

## (Policy or Custom of Deliberate Indifference by Defendants Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve Health)

281. Plaintiff incorporates the paragraphs above as if fully set forth herein.

282.  At the time of the events in this case, Mecklenburg County and Sheriff McFadden had an agreement with Wellpath, LLC who had an agreement with Reserve to provide medical care to residents and detainees at MCDCC. Under Reserve's agreement, Reserve was only required to have the Medical Director, Dr. Biondi, present one day per week at MCDCC

283.  In addition, Mecklenburg County Sheriff's Office had Policies and Procedures for MCDCC that were reviewed and approved by the County in consultation with Wellpath, LLC, Reserve and Dr. Biondi and Sheriff McFadden.

284.  On or before January 20, 2024, Mecklenburg County, Sheriff McFadden, Dr. Biondi and Reserve knew that:

   a.  Individuals with severe drug or alcohol intoxication were regularly arrested and brought to MCDCC for booking and admission;

   b.  Under the Policies and Procedures, individuals with severe drug addiction were not classified as persons who may need "immediate medical care" and instead of being sent to the Emergency Room at a local hospital, those persons were admitted to MCDCC;

   c.  The MCDCC Medical Director from Reserve, Dr. Biondi, was only available in person once a week and regularly made medical decisions for residents over the phone without seeing them;

   d.  MCDCC did not have sufficient medical staffing, supervision, and resources to medically treat and monitor residents with severe drug or alcohol intoxication or addiction;

e. A resident with severe drug or alcohol intoxication or addiction was likely to seek illicit drugs and/or suffer withdrawal syndrome;

f. Sheriff McFadden had a policy to allow some people and MCDCC staff to enter MCDCC without first going through the body scanner;

g. Illicit drugs were readily available in the MCDCC;

h. "Man-Down" drills, as defined by NCCHC, and which required detention staff and medical staff to practice what to do in situations requiring immediate medical intervention, were not conducted often enough for detention staff and medical staff to be proficient in an emergency;

i. Wellpath, LLC provided nursing staff for MCDCC, such as Defendant Shaba, that were not physically capable of responding quickly to a resident's medical emergency or serious medical need;

j. Wellpath, LLC provided nursing staff for MCDCC, such as Defendants Shaba, Banks, Scott, Jones, Slade and Bethea who were not properly trained to respond in a medical emergency requiring CPR and the assembly and use of a suction unit to prevent a resident's death;

k. Residents with severe drug intoxication were confined in single cells at MCDCC without adequate assessment or monitoring by a qualified medical provider and would only receive emergency medical care once an imminent life or death situation existed;

l. Detention Staff, such as Defendant Beatty, were not properly trained or properly supervised to adequately monitor residents with serious medical needs assigned to the infirmary such as Mr. Benfield;

m. The following residents died while in MCDCC under the care, custody and safekeeping of Defendant McFadden, his staff and/or MCDCC medical staff, as a result of McFadden and MCDCC staff improperly monitoring and supervising MCDCC residents, improperly training and supervising MCDCC supervisors, detention officers and others assigned to work in the MCDCC, failure to comply with North Carolina statutes and/or administrative codes and/or NCCHC standards and/or failure to provide adequate general or emergency medical or mental healthcare for MCDCC residents including:

> *Kenneth Bingham*
>
> *Russell Fincham*
>
> *Derrick Geter*
>
> *Karon Golightly*
>
> *Karla Griffin*
>
> *John Devin Haley*
>
> *Elijah Kelly*
>
> *Francine Laney*
>
> *Michael Mangan*
>
> *Jemarcus McIlwaine*
>
> *Bryon Miller*

*William Rhinesmith*

*Jerome Thompson*

*Michael Trent*

*Desmond Whisnant*

n. The Sheriff's Department had been previously cited by NCDHHS on multiple occasions for failure to provide supervisory rounds as required by law; and

o. Adequate supervisory rounds wherein the detention officer or supervisor actually observe the resident and see that the resident is not in medical or mental health distress is vital when the resident has serious medical needs, of which the detention staff and medical staff are aware.

## A. Mecklenburg County

285. Mecklenburg County was aware that the agreement with Wellpath, LLC and Reserve provided inadequate medical care and supervision for residents with serious medical needs.

286. Upon information and belief, Mecklenburg County was aware of Sheriff McFadden's practice or unofficial policy to admit residents with sever drug intoxication into MCDCC rather than send them to the hospital for emergency medical care.

287. Mecklenburg County approved or condoned these policies or customs and did not have a Medical Plan that provided adequate medical care, medical supervision, and emergency medical services for residents with severe drug intoxication at MCDCC.

288. Through its approval of the policies or customs at MCDCC, the inadequate Medical Plan, and the contractual relationship with Wellpath, LLC and Reserve, Mecklenburg County had an official policy or custom of deliberate indifference to the serious medical needs of residents, like George Wesley Benfield, with severe drug intoxication.

289. Mecklenburg County's official policy or custom was a cause of, and the moving force behind, the violation of Mr. Benfield's right to be free from deliberate indifference to his serious medical needs.

290. Mecklenburg County is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused the violation of Mr. Benfield's substantive due process rights at MCDCC.

**B. Defendants Sheriff McFadden and Dr. Biondi**

291. Sheriff McFadden and Dr. Biondi approved the Medical Plan and the unwritten policy or custom to admit and house residents with severe drug or alcohol intoxication without properly monitoring or caring for them.

292. Sheriff McFadden's official policies or customs were inadequate because they did not provide appropriate supervision or medical care to residents with serious medical needs from severe drug or alcohol intoxication.

293. In addition, on or before January 20, 2024, Sheriff McFadden and Dr. Biondi knew that:

a. Due to the number of inmates with severe drug or alcohol intoxication, in-service training was needed on detecting and handling medical and mental health emergencies from severe drug or alcohol intoxication;

b. No in-service training was provided to the detention staff on detecting and handling medical and mental health emergencies from severe drug or alcohol intoxication;

c. The decision about whether to admit or obtain medical treatment for a resident with severe drug or alcohol intoxication during the nightshift was made by inadequately trained detention officers and medical staff without any medical supervision on site;

d. Sheriff McFadden had a non-delegable duty to provide emergency medical care to residents with serious medical needs; and

e. Sheriff McFadden gave the responsibility to Wellpath, LLC and Reserve to provide emergency medical care to residents without requiring the medical staff participate in "man down" drills to determine they were adequately trained and physically capable of responding in a medical emergency.

294. Sheriff McFadden and Dr. Biondi failed to provide adequate training to detention officers and medical staff, respectively, at MCDCC on detecting, screening, and handling medical and mental health emergencies from severe drug or alcohol intoxication.

295. Sheriff McFadden and Dr. Biondi knew that detention officers and medical staff would come into contact with residents with serious medical needs from severe

drug or alcohol intoxication and, without adequate training and policies, these residents would frequently not receive proper medical attention and care in violation of their substantive due process rights.

296. Sheriff McFadden and Dr. Biondi's failure to provide adequate training to the detention officers and medical staff, respectively, showed a deliberate indifference to the rights of residents, including Mr. Benfield.

297. Sheriff McFadden and Dr. Biondi had official policies and/or customs of deliberate indifference to the serious medical needs of residents, like Mr. Benfield, with severe drug intoxication.

298. The Detention Defendants acted in accordance with Sheriff McFadden's policies or customs through their deliberate indifference to the serious medical needs of Mr. Benfield on January 19–20, 2024.

299. Sheriff McFadden and Dr. Biondi condoned the decisions by the detention staff and medical staff respectively, to admit Mr. Benfield and hold him for detoxification with adequate medical treatment monitoring.

300. Sheriff McFadden and Dr. Biondi's official policies and/or customs were a cause of, and the moving force behind, the violation of Mr. Benfield's right to be free from deliberate indifference to his serious medical needs.

301. Sheriff McFadden and Dr. Biondi are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policies or customs which caused the violation of Mr. Benfield's substantive due process rights at MCDCC.

## C. Reserve Health

302.   Dr. Biondi approved Sheriff McFadden's policy or custom of allowing insufficiently trained individuals to determine if emergency medical services were needed for a resident at MCDCC.

303.   Reserve, through Dr. Biondi, knew that Sheriff McFadden's policy and custom did not provide appropriate medical care to residents with serious medical needs from severe drug or alcohol intoxication.

304.   Dr. Biondi acted in accordance with this policy or custom when he made the decision not to examine Mr. Benfield or refer Mr. Benfield for emergency medical services on January 20, 2024.

305.   In addition, on or before January 20, 2024, Reserve failed to provide adequate medical staffing at MCDCC and failed to provide adequate supervision of the nursing staff on medical and mental health emergencies from severe drug or alcohol intoxication.

306.   Reserve knew that the nursing staff and detention staff at MCDCC would come into contact with residents with serious medical needs from severe drug or alcohol intoxication, and that without adequate medical staffing, and supervision and training, of staff, residents would frequently not receive proper medical attention and care in violation of their substantive due process rights.

307.   Reserve's failure to provide adequate staffing, supervision and training showed a deliberate indifference to the rights of residents, including Mr. Benfield.

308. Reserve had official policies or customs of deliberate indifference to the serious medical needs of residents, like Mr. Benfield, with severe drug intoxication.

309. Dr. Biondi acted in accordance with Reserve's policy or custom through his deliberate indifference to the serious medical needs of Mr. Benfield.

310. Reserve's official policies or customs were a cause of, and the moving force behind, the violation of Mr. Benfield's right to be free from deliberate indifference to his serious medical needs.

311. Reserve is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused the violation of Mr. Benfield's substantive due process rights at MCDCC.

## THIRD CLAIM FOR RELIEF

### (Action on Official Bond Against Defendants Sheriff McFadden and Ohio Casualty)

312. Plaintiff incorporates the paragraphs above as if fully set forth herein.

313. Sheriff McFadden procured an official bond as principal from Ohio Casualty in the sum of $25,000 and such bond was in effect at all relevant times to his action.

314. Ohio Casualty joined with Sheriff McFadden as surety in the execution of the official bond and thereby undertook to be jointly and severally liable for the failure for Sheriff McFadden and his detention officers to faithfully perform the duties of his office as Sheriff of Mecklenburg County.

315. The Detention Defendants were acting within the course and scope of their employment as Mecklenburg County detention officers and under color of state law

under Sheriff McFadden's office during their interactions with Mr. Benfield on January 19-20, 2024.

316.    The acts and omissions of the Detention Defendants, as alleged in this action and imputed to Sheriff McFadden under the doctrine of *Respondeat Superior*, constituted neglect, misconduct, misbehavior and/or a breach of their official duties as detention officers.

317.    Sheriff McFadden and Ohio Casualty are jointly and severally liable to Plaintiff, pursuant to N.C. Gen. Stat. § 58-76-5, for Mr. Benfield's personal injuries and wrongful death to the extent of the official bond.

## FOURTH CLAIM FOR RELIEF

### (Medical Malpractice by Medical Defendants and Dr. Biondi)

318.    Plaintiff incorporates the paragraphs above as if fully set forth herein.

319.    During their care of Mr. Benfield, Defendants Graham, Bethea, Banks, and Shaba had a duty to use their best judgment, to use reasonable care and diligence in the application of their knowledge and skill to Mr. Benfield's care, and to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities.

320.    During their care of Mr. Benfield, Defendants Scott, Jones and Slade had a duty to use their best judgment, to use reasonable care and diligence in the application of their knowledge and skill to Mr. Benfield's care, and to provide health care in accordance with the standards of practice among licensed nurse practitioners with similar training and experience in the same or similar communities.

321. During his care of Mr. Benfield, Defendant Dr. Biondi had a duty to use his best judgment, to use reasonable care and diligence in the application of his knowledge and skill to Mr. Benfield's care, and to provide health care in accordance with the standards of practice among family medicine physicians with similar training and experience in the same or similar communities.

## A. LPN Graham

322. At a minimum Defendant LPN Graham was negligent and breached her duty of care to Mr. Benfield by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Benfield's care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities, including by:

    a. Failing to recognize Mr. Benfield's medical ineligibility for admission to MCDCC;

    b. Failing to have Mr. Benfield seen, in person, by a medical provider with prescribing authority;

    c. Failing to collect his vital signs between 12:06 a.m. and his transfer to the infirmary at approximately 1:50 a.m.;

    d. Failing to communicate the basis of Mr. Benfield's serious medical needs to Defendant D.O. Beatty and Defendant Shaba;

e. Failing to review and consider Mr. Benfield's available medical records upon, during and after his admission to the MCDCC between January 19th and 20th, 2024;

f. Failing to refer Mr. Benfield for emergency medical services;

g. Failing to provide any medical treatment or care for Mr. Benfield;

h. Otherwise neglecting Mr. Benfield and failing to treat his medical condition; and

i. In such further ways as may be shown by the evidence.

LPN Graham was grossly negligent in her care of Mr. Benfield because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Benfield, and (e) intentionally failed to comply with her duties as a licensed practical nurse.

## B. Nurse Bethea

323. At a minimum Defendant Nurse Bethea was negligent and breached her duty of care to Mr. Benfield by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Benfield's care, and failing to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities, including by:

a. Failing to recognize Mr. Benfield's medical ineligibility for admission to MCDCC;

b. Failing to have Mr. Benfield seen, in person, by a medical provider with prescribing authority;

c. Failing to collect his vital signs between 12:06 a.m. and his transfer to the infirmary at approximately 1:50 a.m.;

d. Failing to communicate the basis of Mr. Benfield's serious medical needs to Defendant D.O. Beatty and Defendant Shaba;

e. Failing to review and consider Mr. Benfield's available medical records upon, during and after his admission to the MCDCC between January 19th and 20th, 2024;

f. Failing to refer Mr. Benfield for emergency medical services;

g. Failing to provide adequate medical treatment or care for Mr. Benfield;

h. Failing to properly assemble the suction unit;

i. Failing to clear Mr. Benfield's airway;

j. Failing to properly give Mr. Benfield emergency breaths;

k. Failing to continue to give CPR until relieved from this duty;

l. Otherwise neglecting Mr. Benfield and failing to properly treat his medical condition; and

m. In such further ways as may be shown by the evidence.

324. Nurse Bethea was grossly negligent in her care of Mr. Benfield because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless

disregard for the rights and safety of Mr. Benfield, and (e) intentionally failed to comply with her duties as a registered nurse.

## C. Nurse Banks

325.   At a minimum Defendant Nurse Banks was negligent and breached her duty of care to Mr. Benfield by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Benfield's care, and failing to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities, including by:

   a.  Failing to provide adequate medical treatment or care for Mr. Benfield;

   b.  Failing to properly assemble the suction unit;

   c.  Failing to clear Mr. Benfield's airway;

   d.  Failing to properly give Mr. Benfield emergency breaths;

   e.  Failing to continue to give CPR until relieved from this duty;

   f.  Otherwise neglecting Mr. Benfield and failing to properly treat his medical condition; and

   g.  In such further ways as may be shown by the evidence.

326.   Nurse Banks was grossly negligent in her care of Mr. Benfield because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Benfield, and (e) intentionally failed to comply with her duties as a registered nurse.

**D.  Nurse Shaba**

327.   At a minimum Defendant Nurse Shaba was negligent and breached her duty of care to Mr. Benfield by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Benfield's care, and failing to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities, including by:

a.  Failing to assess his condition and prepare a plan of care, including have Narcan ready for immediate use;

b.  Failing to take and/or record his vital signs;

c.  Failing to document Mr. Benfield's condition;

d.  Failing to medically monitor his detoxification;

e.  Failing to immediately place an emergency call for help the first time she saw Mr. Benfield folded over and unresponsive;

f.  Failing to administer aid to Mr. Benfield the first time she saw him folded over and unresponsive;

g.  Failing to immediately place an emergency call for help the second time she saw Mr. Benfield folded over and unresponsive;

h.  Failing to know how to quickly open the container holding the Narcan;

i.  Failing to immediately administer Narcan to Mr. Benfield;

j.  Failing to call for emergency medical assistance when Nurse Banks was unable to immediately respond to help;

k. Otherwise neglecting Mr. Benfield and failing to respond to his emergency medical needs; and

l. In such further ways as may be shown by the evidence.

328. Nurse Shaba was grossly negligent in her care of Mr. Benfield because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Benfield, and (e) intentionally failed to comply with her duties as a registered nurse.

**E. LPNs Scott, Jones and Slade**

329. At a minimum Defendant Scott, Jones and Slade were negligent and breached their duty of care to Mr. Benfield by failing to use their best judgment, failing to use reasonable care and diligence in the application of their knowledge and skill to Mr. Benfield's care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities, including by:

a. Failing to properly assemble the suction unit;

b. Failing to clear Mr. Benfield's airway;

c. Failing to properly give Mr. Benfield emergency breaths;

d. Failing to continue to give CPR until relieved from this duty;

e. Otherwise neglecting Mr. Benfield and failing to respond to his emergency medical needs; and

f. In such further ways as may be shown by the evidence.

330.    Licensed Practical Nurses Scott, Jones and Slade were grossly negligent in their care of Mr. Benfield because their actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Benfield, and (e) intentionally failed to comply with their duties as licensed practical nurses.

## F.    Dr. Biondi

331.    Dr. Biondi was negligent and breached his duty of care to Mr. Benfield by failing to use his best judgment, failing to use reasonable care and diligence in the application of his knowledge and skill to Mr. Benfield's care, and failing to provide health care in accordance with the standards of practice among family medicine physicians with similar training and experience in the same or similar communities, including by:

a.    Providing medical clearance for Mr. Benfield's admission to MCDCC;

b.    Failing to examine Mr. Benfield or have Mr. Benfield seen, in person, by a medical provider with prescribing authority;

c.    Failing to order Nurse Graham and Nurse Bethea to collect Mr. Benfield's vital signs between 12:06 a.m. and his transfer to the infirmary at approximately 1:50 a.m.;

d.    Failing to address Mr. Benfield's rapid pulse rate and his low oxygen saturation levels;

e.  Failing to communicate the basis of Mr. Benfield's serious medical needs to Defendant D.O. Beatty and Defendant Shaba;

f.  Failing to prepare a plan of care for Mr. Benfield, including but not limited to specific COWS and CIWA protocol for Mr. Benfield;

g.  Failing to review and consider Mr. Benfield's available medical records upon, during and after his admission to the MCDCC between January 19th and 20th, 2024;

h.  Failing to refer Mr. Benfield for emergency medical services;

i.  Failing to provide any medical treatment or care for Mr. Benfield;

j.  Failing to properly supervise the care provided by Nurse Shaba to Mr. Benfield

k.  Otherwise neglecting Mr. Benfield and failing to treat his medical condition; and

l.  In such further ways as may be shown by the evidence.

332.  Dr. Biondi was grossly negligent in his care of Mr. Benfield because his actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Benfield, and (e) intentionally failed to comply with his duties as a family medicine physician.

333.  The Medical Defendants were employed by Wellpath, LLC and acting within the course and scope of their employment when they provided nursing care to Mr. Benfield at MCDCC.

334. Dr. Biondi was employed by Reserve acting within the course and scope of his employment when he was consulted about medical care for Mr. Benfield at MCDCC.

335. Reserve is vicariously liable to Plaintiff, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice by Dr. Biondi.

## FIFTH CLAIM FOR RELIEF

### (Corporate Negligence and Gross Negligence by Defendant Reserve)

336. Plaintiff incorporates the paragraphs above as if fully set forth herein.

337. At all times relevant to this action, Reserve had a duty to use reasonable care in performing its corporate policy, management, and/or administrative functions and decisions at MCDCC.

338. At all times relevant to this action, Reserve was aware that it needed adequate policies and training for medical staff at MCDCC on emergency medical care and medical monitoring for residents with severe drug or alcohol intoxication.

339. In addition, Reserve was aware that the Medical Defendants were not fit to provide all of the nursing care at MCDCC to a resident with serious medical needs, like Mr. Benfield, because they lacked the necessary skills, training, and experience, and were inadequately supervised by Dr. Biondi or another physician.

340. Reserve was negligent and breached its duty of care to Mr. Benfield by:

    a. Failing to have an adequate policy on emergency medical care for residents with severe drug or alcohol intoxication at MCDCC;

b. Failing to provide proper training for the nursing staff on emergency medical care and medical monitoring for residents with severe drug or alcohol intoxication;

c. Allowing all of the medical care for residents with serious needs at MCDCC to be provided by an RN or LPN without appropriate onsite medical supervision;

d. Failing to have a physician or physician extender present at MCDCC more than five times per week;

e. Failing to have a policy requiring an in-person medical examination by a physician or other provider before granting medical clearance for admission to MCDCC of a person with abnormal vital signs or other serious medical needs;

f. Failing to properly monitor and supervise the performance of Nurse Graham, Nurse Bethea and Nurse Shaba;

g. Failing to have proper policies, staffing and/or supervision at MCDCC to provide appropriate medical care for residents with serious medical needs from severe intoxication; and

h. In such further ways as may be shown by the evidence.

341. Reserve was grossly negligent in performing its corporate administrative duties due to its willful or wanton conduct.

342. Reserve failed to carry out its duties imposed by law or contract which were necessary to protect the safety of residents at MCDCC and acted with conscious and

intentional disregard for the rights and safety of others, including George Wesley Benfield.

343.    Reserve is liable to Plaintiff for corporate and administrative negligence that caused Mr. Benfield's personal injuries and wrongful death at MCDCC.

## DAMAGES

344.    As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, George Wesley Benfield suffered severe personal injuries during his pre-trial detention at MCDCC from the deterioration of his health, including alcohol and opiate withdrawal syndromes, overdose, respiratory failure, and cardiac arrest

345.    Due to his personal injuries, Mr. Benfield experienced physical pain, mental suffering and mental anguish.

346.    Mr. Benfield also experienced disability, and hardship from the loss of use of his body and mind due to his physical injuries and the deterioration of his medical condition.

347.    Plaintiff, as the Administrator of the Estate of George Wesley Benfield, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Benfield's personal injuries under N.C. Gen. Stat. § 28A-18-1.

348.    As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Mr. Benfield died on January 20, 2024.

349.    Mr. Benfield would be alive if Defendants had obtained appropriate medical

attention and treatment for his serious medical needs.

350. Mr. Benfield was 43 years old at the time of his death.

351. Mr. Benfield is survived by his mother, Tamra Benfield, who is his sole heir under the North Carolina Intestate Succession Act, N.C. Gen. Stat. § 29-1, *et seq.*

352. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Plaintiff, as the Administrator of the Estate of George Wesley Benfield, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

    a. Compensation for the pain and suffering of Mr. Benfield;

    b. The reasonable funeral expenses of Mr. Benfield;

    c. The present monetary value of Mr. Benfield to his mother of the reasonably expected:

        i. Services, protection, care, and assistance of Mr. Benfield, whether voluntary or obligatory, to his mother; and

        ii. Society, companionship, comfort, guidance, kindly offices, and advice of Mr. Benfield to his mother.

353. Plaintiff, as the Administrator of the Estate of George Wesley Benfield, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Benfield's wrongful death under N.C. Gen. Stat. § 28A-18-2.

354. The acts of deliberate indifference to Mr. Benfield's serious medical needs by Chief White, Capt. Houpe, Capt. Durrah, Sgt. Mackin, D.O. Beatty, D.O. Parker, Dr. Biondi, Nurse Graham, Nurse Bethea, Nurse Banks, Nurse Shaba, LPN Scott, LPN

Jones and LPN Slade were done with reckless or callous indifference to Mr. Benfield's civil rights. Plaintiff is entitled to recover punitive damages from these Defendants under 42 U.S.C. § 1983.

355.    The policies and customs of deliberate indifference to the serious medical needs of residents with severe drug intoxication, like Mr. Benfield, by Mecklenburg County, Reserve, Sheriff McFadden and Dr. Biondi were done with reckless or callous indifference to MCDCC residents' civil rights. Plaintiff is entitled to recover punitive damages from these Defendants under 42 U.S.C. § 1983

356.    The acts of medical malpractice by the Medical Defendants and Dr. Biondi, as alleged above, were done with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Benfield, which each of them knew or should have known was reasonably likely to result in injury, damage or other harm, including death.

357.    The medical malpractice committed by the Medical Defendants and Dr. Biondi was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

358.    The acts of corporate negligence and gross negligence by Reserve, as alleged above, were done with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Benfield, which Reserve knew or should have known was reasonably likely to result in injury, damage or other harm, including death.

359.    Upon information and belief, Reserve intentionally provided inadequate staffing, monitoring, and supervision at MCDCC which placed residents at risk of

serious injury or death in order to increase profits.

360. The corporate negligence and gross negligence committed by Reserve was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

361. Dr. Biondi, an officer, manager and owner of Reserve, participated in and/or condoned the willful or wanton conduct by Reserve.

362. Plaintiff is entitled to recover punitive damages from Medical Defendants and Dr. Biondi under N.C. Gen. Stat. § 1D-5.

363. Plaintiff is also entitled to recover reasonable attorneys' fees and litigation expenses from Defendants (excluding Ohio Casualty) pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from Defendants, jointly and severally, for Mr. Benfield's personal injuries and wrongful death;

2. Punitive damages from the Medical Defendants, Detention Defendants, Dr. Biondi and Reserve under 42 U.S.C. § 1983;

3. Punitive damages from the Medical Defendants, Dr. Biondi and Reserve under N.C. Gen. Stat. § 1D-15.

4. Reasonable attorneys' fees and litigation expenses from Defendants (excluding Ohio Casualty) pursuant to 42 U.S.C. § 1988;

5. Costs of court and interest as allowed by law;

6. A trial by jury on all disputed issues of fact; and

7. Such other and further relief as the Court may deem just and proper.

This the 14th day of January, 2026.

/s/ Amanda A. Mingo
Amanda A. Mingo, NC State Bar #24423
/s/ Katie C. Clary
Katie Clary, NC State Bar # 39248
*Attorneys for Plaintiff*
Rawls, Scheer, Clary, & Mingo, PLLC
2333 Randolph Road, Suite 100
Charlotte, NC 28207
T: 704-376-2300
amingo@rscmlaw.com
kclary@rscmlaw.com